PEOPLE v SCHOLLAERT

Docket No. 127836. Submitted February 11, 1992, at Grand Rapids. Decided May 4, 1992, at 9:50 A.M. Leave to appeal sought.

Bruce W. Schollaert was convicted by a jury in the Montcalm Circuit Court, Charles W. Simon, Jr., J., of two counts of second-degree murder and one count of possession of a firearm during the commission of a felony. The court sentenced the defendant to two concurrent terms of forty to sixty years' imprisonment for the murder convictions and a consecutive two-year term for the felony-firearm conviction. The defendant appealed.

The Court of Appeals *held:*

1. It was not error to permit the prosecution to elicit testimony and comment concerning the defendant's silence when the police arrived at his home in the early morning hours shortly after the murder of his former wife and her boyfriend. Because the silence occurred before any custodial interrogation and before the defendant had been informed of his constitutional right against self-incrimination, his silence was not constitutionally protected. Because his failure to inquire of the police why they were at his home at that hour was relevant to the question of his guilty knowledge of the murders that had just taken place, the testimony concerning his silence was properly admitted as substantive evidence of that knowledge.

2. Averments concerning the observation of a vehicle similar to the defendant's leaving the scene of the murder, the indications of recent use of the defendant's vehicle when the police arrived at his home shortly after the murders, and the observation of a gun case in the vehicle provided a sufficient basis to find probable cause to issue a warrant to search the defendant's vehicle and house.

3. Testimony concerning the defendant's prior threats and

REFERENCES

Am Jur 2d, Criminal Law §§ 701 *et seq.*

What constitutes "custodial interrogation" within the rule of Miranda v Arizona requiring that suspect be informed of his federal constitutional rights before custodial interrogation. 31 ALR3d 565.

behavior toward his former wife and her boyfriend and the circumstances surrounding the killings provided a sufficient basis to establish premeditation and deliberation. Accordingly, the court properly denied the defendant's motion for a directed verdict of acquittal of first-degree murder.

4. The sentence imposed was one that the defendant reasonably could expect to serve in his lifetime and was proportionate to the seriousness of the circumstances relating to the offenses and the defendant.

Affirmed.

CRIMINAL LAW — SELF-INCRIMINATION — CUSTODIAL INTERROGATION.

Evidence of a defendant's silence and nonresponsive demeanor before any custodial interrogation or warning of the constitutional right against self-incrimination may be admitted as substantive evidence of the defendant's guilty knowledge where the circumstances create an inference that the absence of some response is the result of that knowledge; silence under such circumstances is not constitutionally protected (US Const, Am V; Const 1963, art 1, § 17; MRE 801).

*Frank J. Kelley,* Attorney General, *Gay Secor Hardy,* Solicitor General, *Bruce E. Basom,* Prosecuting Attorney, and *Carole F. Barnett,* Assistant Attorney General, for the people.

*William A. Van Eck* and Bruce W. Schollaert, in propria persona, for the defendant.

Before: McDONALD, P.J., and SULLIVAN and REILLY, JJ.

REILLY, J. Following a jury trial, defendant was convicted of two counts of second-degree murder, MCL 750.317; MSA 28.549, and one count of possession of a firearm during the commission of a felony, MCL 750.227b; MSA 28.424(2), arising out of the shooting deaths of his ex-wife and her boyfriend. Defendant was sentenced to two terms of forty to sixty years of imprisonment, to be served concurrently, for the murder convictions and a consecutive term of two years of imprison-

ment for the felony-firearm conviction. Defendant now appeals as of right. We affirm.

I

Defendant first argues that his convictions must be reversed because the prosecutor impermissibly elicited testimony of and commented on defendant's silence when sheriff's deputies went to his home at 3:30 or 4:00 A.M., shortly after the murders were reported, to take in defendant for questioning.

During the case in chief, the prosecutor asked Bruce Trebian, one of the sheriff's deputies who was present at defendant's house, whether defendant asked why the officers were at his home:

*Q.* Did Mr. Schollaert make any statements to them at that time?

*A.* As to . . .

*Q.* Just make any statements as they walked in.

*A.* It kind of surprised me. The only thing he really mentioned is he more or less acted like he knew them, "Come on in." He invited them in. I thought it kind of strange because its four o'clock in the morning, during that period of time. You know, somebody is beating on your door, and there's two people there with . . .

*Q.* Did he ever say, "What are you guys doing here?" or anything like that?

*A.* I never heard him respond to anything like that until after they'd taken him from the residence and were standing by the edge of the road just before a car pulled up.

The prosecutor asked Lewis Corwin, a detective with the sheriff's department who was also present:

*Q.* And at anytime did he, while you were inside the residence, ask you why you were there?

*A.* He didn't ask me that question.

*Q.* Did you ever hear Bruce make that statement at all?

*A.* No.

Joe Patino, another sheriff's deputy, testified that he asked defendant if he would be willing to go to the station for questioning and that defendant agreed to go. Deputy Patino testified that defendant did not ask what was going on until he was in the police car. However, during his direct examination, defendant stated that he asked Deputy Patino "What's the problem?" when the deputy arrived at his home.

During closing argument, the prosecutor commented on defendant's failure to question why the deputies were at his house:

He [Deputy Trebian] also testified that he thought it was rather unusual, he went into the house after Detective Patino and Detective Corwin and some of the others arrived, that during the five minutes or so that defendant was in the house, he never asked why the officers were there at all. You remember he said he thought that a little unusual.

During rebuttal, the prosecution stated:

The testimony from the police, when they go in, they said they were there for five minutes and he never asked why we were there. The defendant said that wasn't the way it was. But again, what reason would the place [sic] have to lie about it.

Defendant argues that the prosecutor impermissibly used his silence as substantive evidence of his guilt by inferring that an innocent person would have asked why he was being taken in for questioning at 3:30 in the morning.

Although defendant failed to object to the above-noted questions of the prosecutor or to the prosecutor's comments during closing argument, appellate review is nevertheless appropriate where a significant constitutional question is involved. *People v Alexander,* 188 Mich App 96, 101; 469 NW2d 10 (1991).

Defendant asserts that the above-noted questions and comments of the prosecutor violated the rule announced in *People v Bobo,* 390 Mich 355, 359; 212 NW2d 190 (1973). In *Bobo,* the Michigan Supreme Court stated:

> We will not condone conduct which directly or indirectly restricts the exercise of the constitutional right to remain silent in the face of accusation. "Nonutterances" are not statements. The fact that a witness did not make a statement may be shown only to contradict his assertion that he did. *Id.* at 359.

Recently, our Supreme Court has released a series of decisions clarifying the rule announced in *Bobo. People v Sutton (After Remand),* 436 Mich 575; 464 NW2d 276 (1990); *People v McReavy,* 436 Mich 197; 462 NW2d 1 (1990); *People v Cetlinski,* 435 Mich 742; 460 NW2d 534 (1990). In each of these cases, the Court construed *Bobo* as being coextensive with federal precedent, *Sutton, supra* at 579; *McReavy, supra* at 201; *Cetlinski, supra* at 759, and construed the Michigan Constitution consistently with developments in Fifth and Fourteenth Amendment jurisprudence.

In *Cetlinski,* the Court held that the use for impeachment purposes of a defendant's prior statement, including omissions, given during contact with police before arrest or accusation, does not violate the defendant's rights under the federal or

state constitutions. *Cetlinski, supra* at 746-747.[1] In *Sutton,* the Court held that a defendant's exculpatory testimony may be impeached with prearrest or postarrest, pre-*Miranda*[2] silence, but that a defendant's silence after arrest and following the giving of the *Miranda* warnings may not be used to impeach an exculpatory story.[3] However, where the defendant not only offers an exculpatory story, but affirmatively testifies that he had made a post-*Miranda* statement to the police consistent with his trial testimony, the prosecution is permitted to rebut his claim with evidence of the defendant's postwarning silence. *Sutton, supra* at 599. According to the Court, a defendant does not have a constitutional right to immunity from contradiction.

In *McReavy,* the Court addressed the issue whether *Bobo* precluded the admission as substantive evidence of testimony concerning a defendant's behavior and demeanor during a custodial interrogation after a valid waiver of his Fifth Amendment right against compelled self-incrimination. The Court noted that where a defendant's silence is attributable to an invocation of his Fifth Amendment right or a reliance on the *Miranda* warnings, the use of his silence is error. *McReavy, supra* at 201. However, the Court found that because the defendant had waived his Fifth Amendment right, there was no basis to conclude that the defendant's unresponsiveness to some questions

[1] In support of its holding, the Court in *Cetlinski* noted the United States Supreme Court case of *Jenkins v Anderson,* 447 US 231; 100 S Ct 2124; 65 L Ed 2d 86 (1980) (the use of prearrest silence for impeachment purposes did not violate the Fifth Amendment or the Due Process Clause of the Fourteenth Amendment).

[2] *Miranda v Arizona,* 384 US 436; 86 S Ct 1602; 16 L Ed 2d 694 (1966).

[3] See also *Doyle v Ohio,* 426 US 610; 96 S Ct 2240; 49 L Ed 2d 91 (1976), and *Fletcher v Weir,* 455 US 603; 102 S Ct 1309; 71 L Ed 2d 490 (1982).

was attributable to the invocation of that right or reliance on the *Miranda* warnings. Accordingly, the Court concluded that there was no violation of the defendant's right not to incriminate himself. *Id.* at 203.

The present case involves an issue not directly addressed by our Supreme Court in *Sutton, Cetlinski,* or *McReavy.* The question presented here is whether the admission as substantive evidence of testimony concerning a defendant's silence before custodial interrogation and before the *Miranda* warnings have been given is a violation of the defendant's constitutional rights. On the basis of our reading of these cases and certain federal precedent decided since *Bobo,* we conclude that it is not.[4]

The Fifth Amendment and Const 1963, art 1, § 17 provide that no person shall be compelled to be a witness against himself in a criminal trial. The Fifth Amendment privilege has been extended beyond criminal trial proceedings "to protect persons in all settings in which their freedom of action is curtailed in any significant way from being compelled to incriminate themselves." *Miranda v Arizona,* 384 US 436, 467; 86 S Ct 1602; 16 L Ed 2d 694 (1966).

As Justice Stevens, concurring in *Jenkins v Anderson,* 447 US 231, 243-244; 100 S Ct 2124; 65 L Ed 2d 86 (1980), noted:

> The fact that a citizen has a constitutional right to remain silent when he is questioned has no bearing on the probative significance of his silence

---

[4] We recognize that a reading of *People v Sain,* 407 Mich 412; 285 NW2d 772 (1979), and *People v Finley,* 177 Mich App 215; 441 NW2d 774 (1989), might indicate a contrary result. However, both of these cases relied on the rule announced in *Bobo* that we believe has been greatly restricted by the latest decisions of our Supreme Court and developments in federal law.

before he has any contact with the police. We need not hold that every citizen has a duty to report every infraction of law that he witnesses in order to justify the drawing of a reasonable inference from silence in a situation in which the ordinary citizen would normally speak out. When a citizen is under no official compulsion whatever, either to speak or remain silent, I see no reason why his voluntary decision to do one or the other should raise any issue under the Fifth Amendment. For in determining whether the privilege is applicable, the question is whether petitioner was in a position to have his testimony compelled and then asserted his privilege, not simply whether he was silent. A different view ignores the clear words of the Fifth Amendment.

See also Justice BOYLE's concurring opinion in *People v Collier,* 426 Mich 23, 39-40; 393 NW2d 346 (1986).

In the present case, when the sheriff's deputies entered defendant's home, defendant was not in a custodial interrogation situation where he was compelled to speak or to assert his right to remain silent. Although defendant was the focus of the police investigation at that point, the relevant inquiry is whether he was subjected to police interrogation while in custody or deprived of his freedom of action in a significant way. *Beckwith v United States,* 425 US 341; 96 S Ct 1612; 48 L Ed 2d 1 (1976); *People v Hill,* 429 Mich 382; 415 NW2d 193 (1987).

Assuming that the presence of the police officers in defendant's home significantly deprived him of his freedom of action so that he could be found to be in police custody, there is nothing in the record to indicate that he was subjected to interrogation or questioning while in his home or that his silence was in reliance on the *Miranda* warnings. See *United States v Rivera,* 944 F2d 1563, 1568

(CA 11, 1991), where the court found that no constitutional difficulties arose out of the presentation as substantive evidence of testimony concerning the defendant's silence before or after his arrest, but before the defendant was given *Miranda* warnings. Compare *Wainwright v Greenfield,* 474 US 284, 295; 106 S Ct 634; 88 L Ed 2d 623 (1986), where the Supreme Court held that the use of a defendant's postarrest, post-*Miranda* silence as substantive evidence of his sanity was a violation of the Due Process Clause of the Fourteenth Amendment.

This case is also analogous to the situation in *McReavy, supra.* In *McReavy,* the Court found that because the defendant had previously waived his rights, there was no basis to conclude that his nonresponsiveness was attributable to the invocation of his Fifth Amendment privilege or a reliance on the *Miranda* warnings. Therefore, the Court concluded that admission of evidence regarding the defendant's demeanor during questioning was not a violation of his Fifth Amendment right not to incriminate himself. The Court noted in *McReavy, supra* at 221, n 28:

> The dissent erroneously characterizes the testimony of the detectives in this case as comments on periods of silence which are constitutionally protected, even though silences so protected are those in which a defendant has exercised the right to remain silent.

In the present case, defendant's silence or nonresponsive conduct did not occur during a custodial interrogation situation, nor was it in reliance on the *Miranda* warnings. Therefore, we believe that defendant's silence, like the "silence" of the defendant in *McReavy,* was not a constitutionally protected silence. On the basis of our reading of

the Michigan Constitution, together with developments in Fifth and Fourteenth Amendment jurisprudence, we conclude that defendant's constitutional rights were not violated when evidence of his silence was admitted as substantive evidence.

Having concluded that defendant's silence was not a constitutionally protected silence, we must now determine whether the testimony regarding his failure to question why the sheriff's deputies were at his home was admissible under the Michigan Rules of Evidence. Defendant's failure to question the presence of the deputies was relevant as evidence of his consciousness of guilt. See, e.g., *McReavy, supra* at 203. Furthermore, we note that the testimony regarding defendant's failure to question why the sheriff's deputies were at his home was not contrary to *People v Bigge,* 288 Mich 417; 285 NW 5 (1939). The rule in *Bigge* precludes the admission of evidence of a defendant's failure to say anything in the face of an accusation as an adoptive or tacit admission of the truthfulness of the accusation under MRE 801(d)(2)(B) unless the defendant has "manifested his adoption or belief in its truth." See *McReavy, supra* at 213. In the present case, defendant's failure to question the presence of the deputies at his home at 3:30 A.M. was not allowed into evidence as a tacit admission of any accusation. Rather, defendant's demeanor was admitted as substantive evidence that was relevant to a determination of defendant's guilty knowledge. We find no error.

II

Defendant's next argument is that the trial court erred in denying his motion to suppress the search warrant because the warrant was not supported by probable cause. We disagree.

This Court will reverse a trial court's ruling on a motion to suppress only if the ruling was clearly erroneous. A ruling is clearly erroneous if this Court is left with a definite and firm conviction that a mistake has been made. *People v Martinez,* 187 Mich App 160, 171; 466 NW2d 380 (1991). On the basis of our review of the record, we conclude that the trial court did not clearly err in determining that the search warrant was properly issued.

Evidence of probable cause sufficient to support the issuance of a search warrant exists where, on the basis of all the facts and circumstances, a reasonable person would believe that the evidence of a crime or the contraband sought is in the place requested to be searched. *People v Lucas,* 188 Mich App 554, 567; 470 NW2d 460 (1991).[5]

The affidavit presented to the magistrate in support of the search warrant detailed the facts that led police to believe that defendant was a suspect in the murders and that evidence of the murders would be found in defendant's car and residence. The affidavit stated that defendant had

---

[5] There was a conflict among panels of this Court regarding the applicable standard for reviewing the issuance of a search warrant. See *People v Kort,* 162 Mich App 680, 690; 413 NW2d 83 (1987), and *People v Goins,* 164 Mich App 559, 560; 417 NW2d 499 (1987). This conflict was apparently resolved in *People v Landt,* 188 Mich App 234; 469 NW2d 37 (1991), where the Court held that a reviewing court must look at the affidavits and determine whether the information contained in the documents provides a sufficiently substantial basis of probable cause to conclude that the evidence that is sought will be found in a specific place. However, *Landt* was reversed by an order of the Michigan Supreme Court in *People v Landt,* 439 Mich 866 (1991).

After the issuance of the *Landt* case and before its reversal, another panel of this Court, noting the conflict, found that the magistrate did not abuse his discretion in that case because a substantial basis existed for the determination that probable cause existed. See *Lucas, supra* at 567-568.

We do not believe it is necessary to determine whether the standard employed in *Landt* is still viable or whether the standard employed in *Lucas* is to be followed under Administrative Order No. 1990-6, because we find that the warrant was properly issued under either standard.

been at the sheriff's office earlier on the evening of the murders regarding a problem with his two daughters. At that time, Deputy Burt, who handled defendant's complaint, noticed that defendant was driving a brown Dodge Ramcharger with a white top. Later, another deputy, while approaching the murder scene, saw a vehicle matching this description. The deputy attempted to follow the vehicle, but lost it. Deputy Burt, responding to the report that there had been a shooting at the house of defendant's ex-wife, went to the murder scene and then to defendant's home once he received information that defendant might be involved. When Deputy Burt arrived at defendant's home he saw defendant's vehicle parked in the driveway. Upon investigation, he found that the hood, tires, and brake drums of the vehicle were warm. Deputy Burt saw a gun case through the window of the Ramcharger. The affidavit further stated that the victims had apparently been shot with a shotgun and that 16-gauge shotgun shells were found at the murder scene.

On the basis of the foregoing, we believe that the search warrant was properly issued.

III

Next, defendant argues that the trial court should have granted his motion for a directed verdict because insufficient evidence was presented concerning the elements of premeditation and deliberation to justify submitting the charge of first-degree murder to the jury. We disagree.

When ruling on a motion for a directed verdict, the trial court must consider the evidence presented in the light most favorable to the prosecution to determine whether a rational trier of fact could have found that the essential elements of

the crime were proven beyond a reasonable doubt. *People v Hampton,* 407 Mich 354, 368; 285 NW2d 284 (1979); *People v Heard,* 178 Mich App 692, 702; 444 NW2d 542 (1989).

Before a defendant may be convicted of first-degree murder, the prosecution must prove that the defendant intentionally killed the victim and that the act of killing was premeditated and deliberate. *People v Saunders,* 189 Mich App 494, 496; 473 NW2d 755 (1991). Premeditation and deliberation require sufficient time to allow the defendant to take a second look. *People v Gonzalez,* 178 Mich App 526, 531; 444 NW2d 228 (1989). The elements of premeditation and deliberation may be inferred from the circumstances surrounding the killing. *Saunders, supra* at 496. Premeditation may be established through evidence of the following factors: (1) the prior relationship of the parties; (2) the defendant's actions before the killing; (3) the circumstances of the killing itself; and (4) the defendant's conduct after the homicide. *People v Johnson,* 93 Mich App 667, 675; 287 NW2d 311 (1979); *Gonzalez, supra* at 533.

On the basis of our review of the record, we conclude that sufficient evidence was presented concerning the elements of premeditation and deliberation. Testimony presented at trial established that one of the victims, Beverly Schollaert, defendant's ex-wife, was afraid of defendant, and one of defendant's daughters testified about an incident that occurred about a year before the killings where defendant had been physically abusive to Beverly. Defendant's son testified that two or three days before the murders he heard his father say, in reference to Beverly, "I'm going to kill her; the bitch is dead." Furthermore, there was testimony that defendant was scheduled to appear in court on the morning after the killings

to answer a show cause motion filed by Beverly.
The son also testified that shortly before the mur-
ders he saw defendant smash out the windows of
the car of the other victim, Neil Young, who was
romantically involved with Beverly. We believe
that this testimony together with the circum-
stances surrounding the killings, i.e., Beverly
Schollaert was shot twice and Neil Young was shot
four times with a shotgun, was sufficient to estab-
lish the elements of premeditation and delibera-
tion. Accordingly we find no error in the submis-
sion of the first-degree murder charge to the jury.

IV

Lastly, defendant argues that his sentence of
forty to sixty years violates *People v Moore,* 432
Mich 311; 439 NW2d 684 (1989). We disagree. At
the time defendant was sentenced to a term of
forty to sixty years for the murder convictions and
a consecutive term of two years for the felony-
firearm conviction he was forty-three years old.
Thus, defendant will be eighty-five upon serving
his minimum sentence. Considering regular disci-
plinary credits, *People v Rushlow,* 437 Mich 149,
155; 468 NW2d 487 (1991), defendant will be in his
late seventies at the expiration of his minimum
sentence. Even if the disciplinary credits aren't
considered, defendant's sentence does not violate
*Moore,* because a sentencing court reasonably may
expect a defendant to live into his eighties. *People
v Redman,* 188 Mich App 516, 518; 470 NW2d 676
(1991).

Further, we find that the sentence is proportion-
ate to the seriousness of the circumstances relat-
ing to defendant and the crimes committed. *People
v Milbourn,* 435 Mich 630; 461 NW2d 1 (1990).

Affirmed.